**AFFIRM; and Opinion Filed August 21, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00165-CV

### IN THE INTEREST OF C.J.B., A CHILD

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-30017-2018**

# MEMORANDUM OPINION

Before Justices Brown, Schenck, and Pedersen, III
Opinion by Justice Pedersen, III

E.S.M. (Mother) appeals the termination of her parental rights to her daughter, C.J.B.[1]

Following a bench trial, the trial court found by clear and convincing evidence that Mother had

committed five statutory predicate acts supporting termination, and that termination of Mother's

parental rights was in C.J.B.'s best interest. Mother raises eight appellate issues, challenging the

legal and factual sufficiency of the evidence to support the termination of her rights and the

appointment of the Texas Department of Family and Protective Services as sole managing

conservator of C.J.B. She also complains that the trial court abused its discretion in denying her

motion for an extension of the dismissal date. We affirm the trial court's judgment.

---

[1] A.W.B. (Father) was also a respondent in the trial proceedings. Finding that Father had voluntarily relinquished his parental rights, the trial court ordered Father's parental rights terminated with respect to C.J.B. Father does not appeal the termination.

# I. BACKGROUND

On January 9, 2018, C.J.B. was born by an emergency C-section at Parkland Hospital. She was placed in the neonatal intensive care unit (NICU) because she was premature, in respiratory distress, and tested positive for opiates. The Texas Department of Family and Protective Services (the Department) received a priority referral that Mother had given birth to C.J.B., and that both Mother and child had tested positive for opiates.

On January 26, 2018, the Department filed its original petition for protection of the child, for conservatorship, and for termination in a suit affecting the parent-child relationship pursuant to Chapter 262 of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 262.001–.352. The Department requested permission to take immediate possession of the child and to terminate Mother's parental rights. According to the supporting affidavit of Chelsea Pensata, an investigator with the Department, the referral indicated that when Mother arrived at Parkland Hospital, she was aggressive, belligerent, and yelling at anyone who tried to assist her. She had a bottle of Xanax in her purse and a syringe in her vagina. Mother tested positive for opiates and benzodiazepine; when her baby girl was born, the baby also tested positive for opiates.

In her affidavit, Pensata stated that she spoke to the Parkland Hospital staff and went to the hospital to see C.J.B. She learned from Mother's attorney that immediately after giving birth to C.J.B., Mother had checked herself in to a drug treatment facility—New Directions for Women, located in Costa Mesa, California. Mother's attorney arranged for Pensata to interview Mother by telephone. During the telephone interview, Mother told Pensata that she had relapsed a couple weeks before the emergency C-section. Mother said she last used IV drugs the day before her C-section; she also stated that she had been using heroin and prescription pills four to five times a week. Mother told Pensata that she was unaware of the syringe in her vagina and did not remember anything about the bottle of Xanax.

–2–

According to the supporting affidavit of Heidi Arum Kim, M.D., the attending resident at C.J.B.'s birth, the infant's meconium drug screen was positive for opiates. She also stated, "[t]he infant at this time is occasionally exhibiting signs/symptoms of drug withdrawal, including mild tremors, mottling, respiratory rate greater than 60 breaths/minute and loose stools and is being monitored closely. No treatment has been given as of this time."

The trial court signed orders for emergency care and temporary custody of the child, and named the Department as the child's temporary managing conservator. The Department took possession of C.J.B. When C.J.B. was finally discharged from the hospital, the Department placed her with her paternal grandparents, with whom she continues to live. Mother filed a general denial.

At a hearing on February 14, 2018, which Mother did not attend, the trial court ordered Mother to complete parenting classes, a psychological evaluation, individual counseling, a drug/alcohol assessment, to participate in and successfully complete an inpatient drug/alcohol treatment program, and to comply with any recommendations she received based on her participation in these services. Modinat Showemimo, a conservatorship worker for the Department, was assigned to the case. Showemimo prepared the Family Service Plan and personally delivered it to Mother. Showemimo also prepared the Family Service Plan Evaluation to document Mother's progress.

Mother did not appear at the temporary order hearing because she was still in Costa Mesa, California at New Directions for Women. She told Showemimo that she was in inpatient rehabilitation, but she refused to sign a court-ordered release allowing the Department to verify that she had participated in, or completed, this rehabilitation program. According to her attorney, Mother remained at this rehabilitation facility until February 21, 2018. When the trial court asked her attorney why Mother defied a court order to sign the release, he informed the court that it was his understanding that Mother did not complete the program.

Upon her return to Texas, Mother resumed using heroin and reportedly appeared for child visitations while under the influence of drugs. She was arrested on March 12, 2018, on an outstanding warrant in a pending child abandonment/endangerment case.[2] A month later, she was arrested for theft and possession, and she remained in jail from April 16, 2018 through June 14, 2018. On June 14, 2018, the court signed an order of deferred adjudication in Mother's pending child abandonment/endangerment case, and as part of her community supervision, Mother was ordered to participate in and successfully complete the Cenikor inpatient substance abuse treatment program. The Cenikor program usually takes eighteen to twenty-four months to complete, depending on the individual participant's progress. Mother entered the Cenikor program on June 14, but she left after sixty-two days, on August 6, 2018.

Following Mother's departure from the Cenikor program, the State filed a petition to enter a final adjudication of Mother's guilt in the child abandonment/endangerment case, alleging that Mother had violated the terms and conditions of her community supervision. On August 30, 2018, the court signed a judgment adjudicating Mother's guilt, and sentenced her to six months in jail. Mother was incarcerated from August 30, 2018, through December 30, 2018. When she was released from jail on December 30, 2018, she moved to Maryland.

The trial pertaining to the termination of Mother's parental rights to C.J.B. was scheduled to begin two weeks later, on January 14, 2019. On January 9, 2019, Mother filed an original counterpetition seeking sole managing conservatorship of the child. She also filed a motion requesting (i) an extension of the dismissal date, (ii) a new dismissal date of July 26, 2019, (iii) a new trial date, and (iv) a jury trial.

---

[2] In April 2017, Mother was arrested for drug possession, resisting arrest, public intoxication, and child endangerment after she was found passed out in a vehicle with a syringe stuck in her thigh and her daughter, B.M., in the back seat. An Order of Deferred Adjudication was entered in *State v. Erika Shannon Miller*, Case No. 296-83523-2017, in the 296th Judicial District Court of Collin County, Texas.

–4–

On January 14, 2019, the scheduled trial date, Mother appeared through her appointed counsel and requested that she be allowed to participate by telephone. Counsel also re-urged Mother's motions for an extension of the dismissal date, a continuance of the trial, and a jury trial. The court denied mother's requests and proceeded with the trial.

## II. TRIAL TESTIMONY

At trial, Showemimo testified that Mother's parental rights should be terminated because Mother failed to complete the requirements of her Family Service Plan. She testified that Mother completed her psychological examination, and started, but did not complete the parenting class, individual counseling, and at least two substance abuse treatment programs. Although Showemimo sent Mother for monthly drug testing, she only appeared to be tested on three occasions. Although Mother claimed to be employed, she refused to provide the name of her employer or any paystubs as proof of employment.

Showemimo testified that Mother's parental rights should be terminated for knowingly placing C.J.B. in an environment dangerous to the child's physical and emotional well-being by using drugs while she was pregnant, continuing to use drugs after C.J.B. was born, and failing to complete a substance abuse treatment program. Also, Showemimo stated that Mother's parental rights should be terminated because C.J.B. tested positive for drugs when she was born.

Showemimo expressed concerns about Mother's parenting skills. In her opinion, Mother had not bonded with C.J.B. Showemimo stated that Mother was offered visitation but she did not take it. Mother had court-ordered visitation and could have seen C.J.B. every week; however, Mother only saw C.J.B. five times. When Mother was in the Cenikor program, Showemimo drove C.J.B. to visitation with Mother on two occasions. Showemimo stated that Mother wanted to show her baby to all the other Cenikor residents, but Showemimo observed that Mother had little interest, and appeared uncomfortable, in alone-time with the child. Mother was not allowed to see C.J.B.

while she was incarcerated. However, since Mother has been released from jail, she has not asked to see C.J.B. Showemimo also testified that during her incarceration, Mother made no effort to continue parenting classes or work on other Service Plan requirements, even though classes were available to Mother while she was in jail.

Finally, Showemimo testified that it was in C.J.B.'s best interest for Mother's parental rights to be terminated. She testified that C.J.B. deserves permanency and the Blackwoods, C.J.B.'s paternal grandparents, are the only parents the child knows. She believes that the child is in a safe, stable, long-term home, free of drugs, and it is in her best interest to stay there with people who will protect her. Showemimo testified that, in contrast, C.J.B. does not know Mother. Over the course of the year, Mother "did not demonstrate any progress or complete her services" and in Showemimo's opinion, Mother would continue to be a risk to C.J.B. Showemimo testified that she has not heard from Mother since she was released from jail. She learned that Mother had moved to Maryland but she does not know where Mother is living, she does not know if Mother has employment, and she does not know if Mother is continuing to take drugs. Because Mother lives in Maryland, Showemimo is unable to send her for drug testing.

Kristen Belloni, Ph.D., LP., psychologist, conducted Mother's psychological evaluation on April 4, 2018. Mother admitted to Belloni that prior to January 2018, she was using a gram of heroin and six milligrams of Xanax on a daily basis. Belloni testified that Mother told her that she stopped using drugs on January 9, 2018; however, she later admitted that she had relapsed and had used drugs since January 9. In evaluating Mother, Belloni conducted a parenting inventory. Based on Mother's responses, Belloni concluded that Mother's expectations appear to be inconsistent with the developmental ability of children, she may tend to be demanding and controlling, she appears to have a low level of empathy, and she lacks nurturing skills. Belloni concluded that

Mother may be unable to handle parenting stress. Belloni recommended counseling and parenting classes, as required by the Family Service Plan.

Mary Glazier, a pediatric nurse practitioner at Children's Health, testified that C.J.B. remained in the Parkland Hospital NICU for several weeks. According to C.J.B.'s medical records, she had intrauterine drug exposure and when born, her urine and meconium were both positive for opiates. She also had perinatal exposure to hepatitis C. Glazier explained that nursing staff monitored C.J.B.'s progress and watched for withdrawal symptoms. Although C.J.B. was going through withdrawal at birth, she did not require treatment with methadone. Glazier testified that C.J.B. is doing remarkably well and is meeting her growth and developmental milestones. C.J.B.'s grandmother brings her to her medical appointments. Based on Glazier's observations, the child and her grandmother have a loving relationship.

Pam Karnes, the admissions manager at Cenikor Foundation, testified that Mother knew that participation in the Cenikor program was a requirement of her probation. During the intake interview, Mother told Karnes that she last used Xanax and heroin on April 14, 2018. Karnes testified that during her stay at Cenikor, Mother had a poor attitude, was disrespectful, and generally noncompliant with the rules and guidelines of the program. After Mother prematurely left the program, she attempted to return but there was no longer room for her at the Fort Worth location. She was given the opportunity to go to another Cenikor location, but she did not report to that facility.

Gail Wood, the CASA volunteer for C.J.B., testified at trial and concurred that it was in C.J.B.'s best interest for Mother's parental rights to be terminated. Wood expressed concern over Mother's lack of attention during visitation with C.J.B., and her lack of effort to see C.J.B. when she was not in a treatment program or in jail. She also expressed concern that Mother had not completed the services required by the Family Service Plan. She testified that in her opinion, it

was in the best interest of C.J.B. to remain with her parental grandparents, with the ultimate goal of being adopted by the grandparents.

At the conclusion of the trial, the trial court issued an order terminating Mother's parental rights and awarding the Department sole managing conservatorship. The court found clear and convincing evidence that Mother's rights should be terminated under five grounds—family code sections 161.001(b)(1)(D), (E), (O), (P)(i), and (R)—in addition to finding that termination was in C.J.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P)(i), (R), (b)(2). Mother timely appealed.

## II. TERMINATION OF MOTHER'S PARENTAL RIGHTS

Mother raises eight issues on appeal. Five of Mother's issues challenge the legal and factual sufficiency of the evidence to support termination of her parental rights based on facts and omissions enumerated in sections 161.001(b)(1)(D), (E), (O), (P)(i), and (R). Mother's sixth issue challenges the legal and factual sufficiency of the evidence to support a finding that termination of her parental rights was in the best interest of the child. In her seventh issue, Mother complains that the trial court abused its discretion by appointing the Department as sole managing conservator of C.J.B. In her eighth issue, Mother asserts that the trial court abused its discretion in denying her motion for an extension of the dismissal date in light of her extraordinary circumstances.

"Texas Family Code section 161.001(b) allows for involuntary termination of parental rights if clear and convincing evidence supports that a parent engaged in one or more of the twenty-one enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, ___ S.W.3d ___, No. 18-0508, 2019 WL 2147263, at *1 (Tex. 2019). In this case, the trial court terminated Mother's rights under five grounds—sections 161.001(b)(1)(D), (E), (O), (P)(i), and (R)—in addition to finding that termination was in C.J.B.'s best interest. Ordinarily, only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of

termination where there is also a finding that termination is in the child's best interest—even if the trial court based the termination on more than one ground. *In re C.C.*, No. 05-17-01128-CV, 2018 WL 490921, at *2 (Tex. App.—Dallas Jan. 19, 2018, no pet.) (mem. op.). However, the Texas Supreme Court recently instructed that even when another ground is sufficient for termination, when parental rights have been terminated under either section 161.001(b)(1) (D) or (E), due process mandates that an appellate court review those grounds because of their future consequences with respect to parental rights to other children.[3] *See In re N.G.*, 2019 WL 2147263, at *2–4. Therefore, in this case, we will review subsections (D) and (E).

## A. Standard of Review

Because the fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000), involuntary parental termination must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). Evidence is clear and convincing if it will "produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d at 502. Under both legal and factual sufficiency standards, we (i) consider all the evidence, (ii) defer to the factfinder's credibility determinations, and (iii) determine whether

---

[3] When parental rights have been terminated under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(M).

the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re N.T.*, 474 S.W.3d at 475.

In evaluating the evidence for legal sufficiency, we view the evidence in the light most favorable to the finding, assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could have done so, and disregard all contrary evidence that a reasonable fact-finder could have disbelieved or found incredible. *In re K.M.L.*, 443 S.W.3d at 112. If no reasonable fact-finder could form a firm belief or conviction that the matter to be proven is true, the evidence is legally insufficient. *Id.* at 113.

When reviewing the factual sufficiency of the evidence, we consider all the evidence and determine whether the fact finder could reasonably form a firm belief or conviction that the termination grounds were proven. *In re N.T.*, 474 S.W.3d at 475. We consider whether the disputed evidence is such that a reasonable fact finder could not have reconciled the disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## B. Subsections 161.001(b)(1)(D) and (E)

In her first and second issues, Mother asserts that the evidence is legally and factually insufficient to support the trial court's finding that she endangered C.J.B. under subsections 161.001(b)(1)(D) and (E). Mother argues that her own conduct prior to C.J.B.'s birth cannot be used to establish endangerment under subsections (D) and (E) because, under the family code section 101.003 definition of "child," C.J.B. was not a "child" until she was born. Mother argues that she did not place the child in any condition or surrounding other than the hospital. The Department took possession of C.J.B. immediately following her birth; therefore, according to Mother, the evidence demonstrated that C.J.B. was in a safe and appropriate place from the moment of her birth through the date of trial—first at the hospital where she was born, followed

by a safe and appropriate foster placement with her grandparents. Mother does not cite any authority in support of this argument. To the extent that Mother claims that her conduct during pregnancy cannot be considered to establish endangerment to C.J.B., we disagree. *See In re K.L.B.*, No. 14-09-00061-CV, 2009 WL 3444833, at \*3 (Tex. App.—Houston [14th Dist.] July 16, 2009, no pet.) (mem. op.) ("There is nothing in subsections 161.001(1)(D) or (E) to suggest that the conduct or conditions at issue cannot apply to unborn children. Conduct can endanger the well-being of an unborn child, and an unborn child can be exposed to conditions or surroundings which endanger the unborn child's well-being.").

Subsection (D) provides that a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(D). Subsection (E) allows for termination on proof that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(E). Ground (E) "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied).

Both subsections (D) and (E) use the term "endanger." "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Endangerment under subsection (D) may be established by evidence related to the child's environment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re W.S.*, 899 S.W.2d 772, 776 (Tex.

App.—Fort Worth 1995, no writ). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *Id.*

Under subsection (E), the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court may consider actions and inactions occurring both before and after the child was born to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that the conduct be directed at the child or that the child actually suffers injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *In re J.T.G.*, 121 S.W.3d at 126.

Contrary to Mother's assertions, a mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *Id.* at 125. A parent's drug use can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet.

denied); *see also In re J.T.G.*, 121 S.W.3d at 125 ("Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct."). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). Here, the evidence demonstrates that Mother abused drugs—before, during, and after her pregnancy. Before her pregnancy with C.J.B., Mother was arrested for drug possession, resisting arrest, public intoxication, and child endangerment after she was found passed out in a vehicle with a syringe stuck in her thigh and her daughter, B.M., in the back seat. At trial, Pensata testified that Mother told her that she had been using heroin and prescription pills four to five times a week prior to the birth of C.J.B. In addition, Belloni testified that Mother admitted that prior to January 2018, she was using a gram of heroin and six milligrams of Xanax on a daily basis.

When Mother arrived at the hospital to give birth to C.J.B., she had a bottle of Xanax in her purse and a syringe in her vagina. Mother tested positive for opiates and benzodiazepine; after C.J.B. was born, the baby also tested positive for opiates. The baby showed signs of withdrawal and required close monitoring in the NICU.

During her psychological evaluation, Mother admitted to Belloni that after giving birth to C.J.B., she relapsed and continued using drugs despite the ongoing Department proceedings. In her intake interview at Cenikor, Mother told Karnes that she last used heroin and Xanax on April 14, 2018. The evidence shows that Mother failed to complete court-ordered parenting classes, individual counseling, and several drug treatment programs. She also failed to appear for many of her monthly drug tests.

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *In re*

*S.R.*, 452 S.W.3d at 360–61. Evidence was presented at trial that Mother was in jail from March 12, 2018 to March 14, 2018, from April 16, 2018 to June 14, 2018, and from August 30, 2018 to December 30, 2018. When she was released from jail in December 2018, she moved to Maryland. She did not inform her Department case worker that she had been released from jail, that she was moving out of state, or what her new address would be.

On this record, we conclude the evidence is both legally and factually sufficient to support a finding by clear and convincing evidence that Mother knowingly placed or knowingly allowed C.J.B. to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. We also conclude the evidence is both legally and factually sufficient to support a finding by clear and convincing evidence that Mother consciously engaged in a course of conduct that endangered C.J.B.'s well-being. We overrule Mother's first and second issues.

## C. Best Interest of Child

In addition to the findings under section 161.001(b)(1) of the family code, the trial court also determined that termination of the parent-child relationship was in the best interest of C.J.B. In her sixth issue, Mother argues the evidence is legally and factually insufficient to support this finding. She contends that the Department's evidence consisted of "conclusory and biased testimony" and discounts the fact that "[a]t the time of trial, [Mother] had been clean for at least 123 days and was in the best position since the beginning of the case to meaningfully work on her service plan." Mother concedes that the 123 days she was "clean," are the 123 days she spent in jail. She also urges that termination of her parental rights is not in the best interest of C.J.B. because C.J.B. has a right to know and form a relationship with her older half-sister. Although that older half-sister now lives with her father in New Jersey, Mother argues that she is the only connecting link between the siblings and termination would sever that link.

–14–

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.* (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere."). In reviewing a fact-finder's best interest finding, we consider several non-exclusive factors, including (i) the child's desires, (ii) the child's present and future emotional and physical needs, (iii) present and future emotional and physical danger to the child, (iv) the parent's parental abilities, (v) the programs available to assist a parent to promote the child's best interest, (vi) the parent's plans for the child, (vii) the stability of the home, (viii) the parent's acts or omissions that may indicate the parent-child relationship is not a proper one, and (ix) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

While there is a strong presumption that a child's best interest is served by maintaining the parent-child relationship, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)), the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). The statutory factors to be considered in determining the best interest of the child are (1) the child's

age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b).

C.J.B. was removed from Mother's possession at birth. She is now approximately eighteen months old, and is not old enough to express her desires. She has seen her mother on five occasions. A child's need for permanence is a paramount consideration in evaluating a child's physical and emotional needs. *In re J.D.B.*, 435 S.W.3d 452, 468 (Tex. App.—Dallas 2014, no pet.). C.J.B. has been living with her paternal grandparents since the day she was discharged from the hospital in January 2018. Mary Glazier, nurse practitioner at Children's Health, testified that C.J.B. is doing remarkably well with her grandparents. The child has done well in growth and development and has met all of her developmental milestones. Glazier also observed that C.J.B. and her grandmother appeared to have a loving relationship. Gail Wood, the CASA volunteer for C.J.B., also testified

that the child is healthy and happy with her grandparents. During the same time period, Mother has been in and out of two inpatient drug treatment programs, and incarcerated off and on for 196 days.

Mother's drug-related conduct is a significant factor to which the trial court could have attached great weight in evaluating the best interests of the child. *See Dupree v. Tex. Dept. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Many of Mother's acts and omissions regarding the child are drug-related and due to her lack of control over her life. Mother's use of heroin and Xanax four to five times a week during the pregnancy put the child at risk every time she introduced these drugs into her system. The evidence showed that Mother's heroin use endangered C.J.B.'s health and physical well-being. Because of Mother's heroin and Xanax use, C.J.B. suffered withdrawal symptoms.

Also, the evidence showed that Mother's parental skills were lacking. Belloni testified that Mother may be unable to handle parenting stress because she had unrealistic expectations, a low level of empathy, and lacked nurturing skills. Mother did not complete the parenting classes mandated by the service plan. When Mother was not in jail, she was entitled to weekly visitation with C.J.B.; however, Mother only asked to see C.J.B. on five occasions. There is no evidence of any bonding between Mother and child. Further, during the course of these proceedings, Mother was incarcerated for violating the requirements of her community supervision on a previous judgment for endangering her first child.

The evidence showed that although services were made available to help Mother with her drug related problems and her parenting skills, Mother failed to take advantage of these services. In fact, she failed to complete any component of her service plan.

With respect to plans for the child, if Mother's parental rights are terminated, the Department's goal is for C.J.B.'s parental grandparents to adopt her. Based on statements by

Mother's counsel at trial, Mother moved to Maryland and has a job. She would like to be named a possessory conservator of the child and would like more time to work on the services in her plan. The trial court expressed concern that with Mother located in another state, the court cannot monitor her, cannot send her to take a drug test, and cannot offer services or counseling because the Department cannot pay out-of-state providers for such services.

Considering this evidence under the applicable standards of review, we conclude that the evidence presented at trial and summarized above is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in C.J.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72. We overrule Mother's sixth issue.

## D. Appointment of Conservator

In her seventh issue, Mother contends that the trial court abused its discretion by appointing a nonparent as sole managing conservator of C.J.B. because the evidence did not support a finding that the appointment of a parent as conservator would significantly impair the child's physical health or emotional development. Mother argues that section 153.131(a) establishes a parental presumption and mandates the appointment of a parent as conservator, absent such finding of impairment. *See* TEX. FAM. CODE ANN. § 153.131.

When the parents' rights are terminated, the trial court must appoint "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a); *see In re C.E.C.*, No. 05-17-01482-CV, 2018 WL 3062454, at *8 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op.). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002. Conservatorship determinations are reviewed for an abuse of discretion and will be

–18–

reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

An order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child. *See* TEX. FAM. CODE ANN. § 161.206(b). Because we have decided against Mother regarding her challenge to the portion of the trial court's order terminating her parental rights, that order has divested Mother of her legal rights and duties respecting C.J.B. *See In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). As a result, Mother does not have standing to challenge the portion of the order appointing the Department as sole managing conservator of C.J.B. because any alleged error could not injuriously affect her rights. *Id.* (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, had no standing to challenge conservatorship determination). We overrule Mother's seventh issue.

### E. Motion for Extension

In her eighth issue, Mother argues that the trial court erred in denying her motion for an extension of the dismissal date pursuant to section 263.401. *See* TEX. FAM. CODE ANN. § 263.401(a), (b). Mother moved to extend the dismissal deadline of the underlying termination suit for no more than 180 days, or until July 26, 2019. In her motion, she explained that she had been incarcerated several times, for a total of 195 days, and although she had made substantial progress towards compliance with her service plan, she needed more time to continue those efforts. She urged that the loss of valuable time due to her incarceration had created extraordinary circumstances and she requested 180 days or sufficient time within which to complete the services required by her service plan. She also asked that the trial be rescheduled.

Mother's requested extension date of July 26, 2019 was within the 180–day permissible extension when counting from the Monday following the one-year anniversary of any temporary

order appointing the Texas Department of Family and Protective Services as managing conservator. *See* TEX. FAM. CODE ANN. § 263.401(a). Section 263.401(b) allows the trial court to extend the dismissal deadline if the movant shows "extraordinary circumstances [that] necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id*. § 263.401(b).

We review a trial court's decision to grant or deny an extension of the dismissal date under the abuse of discretion standard. *In re R.J.B.*, No. 05-17-01411-CV, 2018 WL 1755540, at *2 (Tex. App.—Dallas April 12, 2018, no pet.) (mem. op.). "To determine whether a trial court abused its discretion, we must decide whether the trial court acted without any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable." *Id*. Our focus is on the needs of the child, whether extraordinary circumstances necessitate the child remaining in the temporary custody of the Department, and whether continuing such is in the best interests of the child. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied). A parent's incarceration is generally considered to be the parent's fault and not an extraordinary circumstance. *In re R.J.B.*, 2018 WL 1755540, at *2; *In re G.P.*, No. 10-13-00062-CV, 2013 WL 2639243, at *1 (Tex. App.—Waco June 6, 2013, no pet.) (mem. op.).

Here, Mother contends that the extraordinary circumstances necessitating an extension were: (i) she completed many of the services required of her, (ii) the trial court sentenced her to a lengthy jail term that ended only two weeks prior to trial, and (3) she moved to Maryland where she has the stable housing and employment required by the Department. She also asserts that the Department has agreed to extensions in cases that are similar to hers.

Notwithstanding Mother's contentions, during the year that her case was pending, the record establishes that Mother abused drugs—before, during, and after her pregnancy. She was in

and out of two drug treatment programs, without completing either program. She was arrested for possession, and was subsequently arrested and incarcerated for violating the terms of her community supervision probation. She was incarcerated for 196 days—from March 12, 2018 to March 14, 2018, from April 16, 2018 to June 14, 2018, and from August 30, 2018 to December 30, 2018. And once she was released from jail, Mother moved to Maryland without informing the Department. These are not extraordinary circumstances; these are choices Mother made, and the consequences of those choices.

The statute's clear preference is to complete the process within the one-year period. *In re A.J.M.*, 375 S.W.3d at 605. Given this preference and the fact that a parent's incarceration is generally considered to be the parent's fault and not an extraordinary circumstance, we cannot say the trial court abused its discretion in denying Mother's request for an extension. We overrule Mother's eighth issue.

### III. CONCLUSION

We have overruled Mother's first, second, sixth, seventh and eighth issues. Mother's third, fourth, and fifth issues address the three additional grounds—subsections 161.001(b)(1)(O), (P)(i), and (R)—on which the trial court based its judgment of termination, and we need not address these issues in light of our conclusions with respect to Mother's first, second and sixth issues. *See In re C.C.*, 2018 WL 490921, at *2. We affirm the trial court's judgment.


/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE

190165F.P05

–21–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN THE INTEREST OF C.J.B., A CHILD,

No. 05-19-00165-CV

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-30017-2018.
Opinion delivered by Justice Pedersen, III.
Justices Brown and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of August, 2019.